Julie Erickson, State Bar No. 293111
julie@eko.law
Elizabeth Kramer, State Bar No. 293129
elizabeth@eko.law
Kevin Osborne, State Bar No. 261367
kevin@eko.law
**Erickson Kramer Osborne LLP**
44 Tehama Street
San Francisco, CA 94105
Telephone: (415) 635-0631
Facsimile: (415) 599-8088

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAE RHO, individually and on behalf of others similarly situated,<br><br>    Plaintiff,<br><br>VS.<br><br><br>DREAMSOURCE CONSULTING LLC; PREDICTABLE PREMIUM R&D LLC; ALBERTO RIEHL, an individual; and DOES 1 through 10,<br><br>    Defendants. | Case No.: 8:23-CV-00705<br><br>CLASS ACTION COMPLAINT FOR DAMAGES AND RELIEF AND DEMAND FOR JURY TRIAL<br><br>COMPLAINT FOR:<br>1.  Fraud;<br>2.  Negligent Misrepresentation;<br>3.  Unjust Enrichment;<br>4.  Violation of the Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*);<br>5.  Violation of the False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, *et seq.*);<br>6.  Violation of the Nevada Deceptive Trade Practices Act (Nev. Rev. St. §§ 598.0901, *et seq.*); and<br>7.  Violation of the New Jersey Consumer Fraud Act (N.J. Stat. Ann. §§ 56:8-1, *et seq.*). |

Plaintiff TAE RHO ("Plaintiff"), on behalf of himself and others similarly situated ("the Classes"), brings this action against Defendants DREAMSOURCE CONSULTING LLC; PREDICTABLE PREMIUM R&D LLC; and ALBERTO RIEHL, an individual (collectively, "Defendants") for actual damages suffered by Plaintiff and the Classes, statutory damages, penalties, restitution, injunctive relief, and for other recovery specified herein for harm caused by Defendants' fraudulent conduct, negligent misrepresentations, unjust enrichment, and violations of the California Unfair Competition Law, the California False Advertising Law, the Nevada Deceptive Trade Practices Act, and the New Jersey Consumer Fraud Act. This Court has jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005, and based on the allegations in paragraphs 16 through 20 below. Plaintiff alleges upon information and belief, except as to his own actions, the investigation of his counsel, and the facts that are a matter of public record, as follows:

## INTRODUCTION

1.      Insurance is a trillion-dollar industry in the United States, and the life insurance sector is one of its largest and most important components. Life insurance and annuities make up nearly half of the American insurance industry's net premiums, generating revenues that often exceed $150 billion annually according to Forbes. The U.S. Bureau of Labor Statistics reports over 1.2 million Americans work in life insurance industry sales field—a 35 percent increase from 10 years prior.

2.      Life insurance advertising is strictly regulated by state legislation and insurance law enforcement offices throughout the country. Laws in many states, including California, Nevada,  and New York, regulate the manner and content of life insurance advertising, compelling specific disclosures, prohibiting the use of

certain terms, and requiring carriers to implement companywide compliance policies.[1]

3.      To comply with these regulations, insurance carriers implement policies restricting the manner their in-house, or "captive," agents may advertise their products. For example, carriers generally prohibit new agents from making changes to their social media profiles when the changes appear designed to generate new business. They also prohibit new agents from delegating the generation of new leads to third-party vendors or automated applications that contact and market to business targets.

4.      Defendants DreamSource Consulting LLC and Predictable Premium R&D LLC (collectively, "DreamSource") sell an online consulting program called "Predictable Premium" (also referred to herein as "the Program"), marketed to life insurance agents with the promise of generating sales leads. The Program is designed and directed by DreamSource's founder, Defendant Alberto Riehl. Predictable Premium is marketed as a program used successfully by agents from all major life insurance companies, guaranteed to work for agents of any life insurance carrier, big or small, and backed by a 100 percent money-back guarantee.

5.      In reality, the strategies and advertising content that make up the Predictable Premium program violate numerous major life insurance companies' internal advertising rules, rendering the program worthless to agents working for those companies. Defendants affirmatively misrepresent the quality, characteristics, benefits, and nature of the Predictable Premium program as being compatible with all major life insurance companies and omit the material fact that most, if not all, of the Program's strategies cannot be used by agents of such companies.

---

[1] *See, e.g.,* Cal. Code Regs., Tit. 10, §§ 2547-2547.11; NRS 686A.030-686A.050; N.Y. Comp. Codes R. & Regs. Tit. 11, §§ 219.1-219.7.

CLASS ACTION COMPLAINT FOR DAMAGES AND RELIEF AND DEMAND FOR JURY TRIAL

6.      Ultimately, the Predictable Premium program is not designed to help captive agents sell insurance. Instead, it is an endeavor to convert agents participating in the program into salespeople for the program itself.

7.      Additionally, Defendants refuse to honor the 100 percent money-back guarantee. When dissatisfied customers inform Defendants that the program runs afoul of carriers' advertising policies, they are told they must complete more training and pay Defendants more money. When those customers persist in demanding a refund, they are blocked from group communication forums and privately threatened with retaliation, including legal action and formal complaints to the insurance carriers for whom they work. Eventually, Defendants block all means of contact from dissatisfied customers and ignore their demands for the refunds that were guaranteed in Defendants' marketing.

8.      Plaintiff and the Classes are life insurance agents who bought into the Predictable Premium program hoping to grow their customer base. Only upon paying thousands of dollars to DreamSource did it come to light that the program was little more than a set of prohibited advertising tools, including social media posts, Facebook advertisements, and "bots," that violated the policies of their carriers, the largest insurance providers in the industry. Plaintiff and the Classes now seek monetary and non-monetary relief to deter further fraud and remedy their losses.

## THE PARTIES

9.      Plaintiff Tae Rho is, and at all relevant times was, a resident of the state of New Jersey. He is a registered/licensed life insurance agent in the states of New York, New Jersey, and Texas and regularly works in New York and New Jersey for the New York Life Insurance Company ("New York Life" or "NYL"). New York Life is a mutual insurance company that offers life insurance, annuities, and other financial products through individual agents, such as Plaintiff. In December 2013, Plaintiff obtained a license to sell traditional insurance and annuity products. Shortly

after that, he started with New York Life as a "Pre-Training Allowance Subsidy" ("PTAS") agent, and New York Life trained him in basic sales and product servicing. After this training and after he generated a pre-determined amount in commissions, New York Life reclassified Plaintiff as a "Training Allowance Subsidy" ("TAS") agent, and his relationship was governed by a TAS contract. Plaintiff's conduct as a TAS agent was closely monitored by New York Life's compliance department. All advertisements and social media posts were screened to ensure they complied with the company's strict advertising policies. Plaintiff's job responsibilities included "prospecting" for new individuals or businesses who might be interested in New York Life products and approaching such prospective clients. New York Life taught Plaintiff to explain who he was and what he did in a specific manner to ensure he complied at all times with the company's policies. Plaintiff purchased the Predictable Premium from Defendants based on their representations that it complied with all major life insurance companies' advertising policies, including those of New York Life. After paying approximately $5,800 for Defendants' Predictable Premium program and beginning the process of implementing its methodologies, Plaintiff was informed by New York Life's compliance department that the Program's content and practices were prohibited by New York Life policies. After Plaintiff made several requests for a return of the money he paid to Defendants, Defendants stopped communicating with Plaintiff, blocked his access to the program materials, and threatened to report him to New York Life's compliance department. To date, Defendants have not refunded Plaintiff in any amount.

10.     Defendant DreamSource Consulting LLC ("DreamSource") is, and at all relevant times was, a corporation organized under the laws of the State of Nevada and operating from locations in California. The lone officer of DreamSource Consulting LLC is manager Sarah Davidian, the wife of DreamSource founder and Defendant Alberto Riehl. Registration documents for DreamSource filed with the Nevada Secretary of State list the address 2300 West Sahara Ave., Suite 800, in Las

Vegas, Nevada. However, this address is used as a "virtual address" and fictitious residency. DreamSource Consulting LLC has no physical presence at this location or any other location in Nevada. The company identifies its own address, "primary office," and "headquarters" as an office located at 30025 Alicia Pkwy in Laguna Niguel, California. Numerous employees of DreamSource Consulting LLC during the relevant period worked in California.

11.     Predictable Premium R&D LLC is, and at all relevant times was, a corporation, organized and existing under the laws of the State of Nevada. The lone officer of Defendant Predictable Premium R&D LLC is manager Sarah Davidian, the wife of Defendant Alberto Riehl, who uses the address 1930 Village Center Circle, #3-8525, in Las Vegas, Nevada as her address in registration documents filed with the Nevada Secretary of State. This address too is used as a "virtual address" and fictitious residency. Predictable Premium R&D LLC has no physical presence in this location.

12.     Defendant Alberto Riehl is an individual residing in Portland, Oregon. Based on information and belief, at all relevant times Defendant Riehl has maintained a residence at 30902 Club House Drive in Laguna Niguel, California. Defendant Riehl is the founder of Defendant DreamSource Consulting LLC and Predictable Premium R&D LLC and refers to himself variably as the companies' "Chief Technology Officer," "Chief Executive Officer," and "Consultant."

13.     The true names and capacities of Defendants sued in the Complaint under the fictitious names of Does 1 through 10, inclusive, are unknown to Plaintiff who therefore sues such Defendants by such fictitious names. Plaintiffs will amend this complaint to add the true names when they are ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is legally responsible for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

14.     At all relevant times, all Defendants were and are legally responsible for all of the unlawful conduct, policies, practices, acts, and omissions as described in each and all of the foregoing paragraphs, unless otherwise indicated.

15.     At all relevant times, the unlawful conduct against Plaintiff and members of the Classes as described in each and all of the foregoing paragraphs was actuated, in whole or in part, by a purpose to serve all Defendants. At all relevant times, upon information and belief, the unlawful conduct described in each and all of the foregoing paragraphs was reasonably foreseeable by all Defendants and committed under actual or apparent authority granted by all Defendants to all other Defendants such that all of the aforementioned unlawful conduct is legally attributable to all Defendants.

## JURISDICTION AND VENUE

16.     This action is brought as a class action under theories of common law fraud, negligent misrepresentation, and unjust enrichment, as well as violations of California's Unfair Competition Law (Bus. & Prof. Code §§ 17200, *et seq*.) ("UC") and False Advertising Law (Bus. & Prof. Code §§ 17500, *et seq*.) ("FAL"), Nevada's Deceptive Trade Practices Act (Nev. Rev. St. §§ 598.0901, *et seq.*) ("NDTPA"), and New Jersey's Consumer Fraud Act (N.J. Stat. Ann. §§ 56:8-1, *et seq*.) ("NJCFA"), among other laws.

17.     This Court has specific jurisdiction for the claims set forth herein because Defendants have, at all times relevant to this matter, individually or through agents, subsidiaries, officers or representatives, operated, conducted, engaged in and carried on a business venture in this state and maintained an address in this state; marketed, advertised, distributed and sold its program in this state; committed a statutory violation within this state related to the allegations made herein and directed at consumers in this state; and caused injuries to Plaintiff and proposed Class Members, which arose out of the acts and omissions that occurred in the state of California.

CLASS ACTION COMPLAINT FOR DAMAGES AND RELIEF AND DEMAND FOR JURY TRIAL

18.     This Court has personal jurisdiction over Defendants DreamSource Consulting LLC, Predictable Premium R&D LLC, and Alberto Riehl because Defendants do business in the state of California such that they have purposely availed themselves of the privilege of conducting activities in this forum and the claims asserted herein arise from conduct occurring in California. DreamSource regularly transacts business in California. DreamSource states in marketing materials and advertising that its primary office and headquarters is located at 30025 Alicia Parkway, in Laguna Niguel, California; DreamSource's main method of operation and communication with its customers, a Facebook page, states it is located in Laguna Niguel, California; a majority (approximately 55 percent) of Defendants' employees and sales people reside in and conduct business on behalf of Defendants from within California; the only officer listed in DreamSource's corporate filings maintained a residence in California during the relevant period; a substantial number of DreamSource's customers (approximately 65 percent) resided in California and were present in California when exposed to Defendants' marketing material, when they entered agreements with and paid funds to Defendants, and when they participated in Defendants' Predictable Premium program; a substantial number of Defendants' employees and sales people and Defendants' customers, referenced above, possess evidence at their residences in California; during the relevant period, Defendant Alberto Riehl maintained a residence in and conducted business from within California; and, while registered with the Nevada Secretary of State as a Nevada-based limited liability corporation, DreamSource has no physical or mailing address in Nevada, maintains virtually no business presence in the state of Nevada, few if any of the known witnesses reside in Nevada, little if any of the evidence relevant to the matter is located in Nevada, and the only officer of DreamSource listed in the corporate documents filed with the Nevada Secretary of State does not now and has never resided in Nevada during the relevant period.

19.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more proposed Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because a substantial number of proposed Class Members are citizens of states different from Defendants. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

20.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendants conduct substantial business in this District, have sufficient minimum contacts with this District, and otherwise purposely avail themselves of the markets in this District, through the promotion, sale, and marketing of its program in this District. During the relevant time period, Defendants conducted business in and throughout Orange and Los Angeles Counties, including through an address maintained in Laguna Niguel, California, and Defendants' employees and sales people resided in and conducted Defendants' business from Orange and Los Angeles Counties. A substantial number of Defendants' customers entered into agreements with and made payments to Defendants from within this judicial district. Additionally, Defendant Alberto Riehl maintained a residence and conducted business within this District during the relevant period.

## FACTUAL ALLEGATIONS

### Life Insurance Industry

21.     Life insurance agents make a living by earning commissions from the sales of life insurance policies. Finding potential customers is challenging and time-consuming and thus a key part of the job is generating customer leads. Traditional lead-generation strategies include in-person networking and prospecting, as well as "cold calling" and telephone marketing. This is a daunting task, made even more

difficult during the COVID-19 pandemic when in-person marketing was not possible. As such, online marketing and lead generation have become critical to life insurance agents in the current market.

22.     Additionally, other types of insurance, including homeowner or renter, commercial, professional, and automobile, are generally required by law or contract. Life insurance, meanwhile, is rarely mandatory and is usually voluntarily purchased by the insured, making competition for such sales even more intense, and securing leads even more vital for agents to sustain their business.

23.     Life insurance agents sell life insurance policies offered by insurance carriers. Agents are either "captive," meaning they only sell insurance from one company, or "independent," meaning they sell the products of multiple insurance carriers. Most medium to large insurance carriers require newly hired captive agents to undergo training as to the products they will be selling, including the manner in which they are allowed to advertise their products. This training is in addition to the state-specific licensing requirements that agents must meet.

### New York Life and the Life Insurance Industries' Major Carriers

24.     As marketing comprises a large part of an agent's work, most of the large life insurance carriers have comprehensive rules that govern how their agents can advertise and market to ensure compliance with a host of applicable laws and regulations. For example, New York Life—one of the largest life insurance carriers and the carrier for which Plaintiff works—requires that its agents use only pre-approved marketing and sales content and prohibits any marketing strategy that is not pre-approved or otherwise expressly allowed. To ensure strict compliance, agents' online marketing is overseen by the company and agents who violate the rules are subject to discipline and potential termination.

25.     New York Life is the third largest life insurance company in the U.S. by market share, with over $14 billion in total life insurance premiums collected in 2021.

CLASS ACTION COMPLAINT FOR DAMAGES AND RELIEF AND DEMAND FOR JURY TRIAL

26.     Like many carriers, New York Life imposes strict and complex rules on insurance advertising. In New York, where New York Life is based, life insurance carriers must comply with Title 11 of the New York Codes, Rules, and Regulations, section 219.4, which is a 25-part code governing the "form, content and disclosure requirements of advertisements" for insurance products. The law prohibits the use of many specific terms and phrases in insurance advertising and identifies others as "misleading or capable of being deceptive," in violation of the law. New York Insurance Law, section 2122 further requires certain disclosures appear in all insurance-related advertising. Insurance Law section 2123 again prohibits certain misleading advertising language and requires additional disclosures in insurance advertising. Violations of sections 2122 or 2123 may result in penalties or suspension under section 2127. In order to comply with regulations such as these, New York Life's compliance department strictly monitors and pre-screens its agents' advertising.

27.     New York Life issues its agents a compliance questionnaire each year requiring they agree to the following restrictions:

> All advertising material must be approved in advance by New York Life, including posts to internet sites, electronic bulletin boards, and emails.
>
> Agents may not create or claim personal advertisements on unapproved websites such as Google My Business, Yelp, or Alignable.
>
> Agents may not use outside vendors to place calls or send text messages on their behalf.
>
> Agents obtain a prospect's express approval before sending them an e-mail.
>
> Agents generally may not communicate with clients via text for business purposes.
>
> To utilize social networking sites, such as Facebook, LinkedIn and Twitter, agents must be enrolled in a particular program and complete all of that program's requirements.

Posts to social networking sites or changes to social networking profiles may not include business related content, may not display any business telephone or business email contact information, and may not list the agents "Skills or Expertise."

Any changes to an agent's social media profiles must be submitted to and approved by New York Life.

28.     In addition to the annual questionnaire, New York Life's Group Membership Association Division distributes to its agents an "Advertising Style Guide," intended to provide a basic set of rules for drafting marketing materials. The Guide's introduction begins by stating, "Marketing Material must be reviewed by New York Life … Final drafts, encompassing all requested revisions, must be admitted for final approval before marketing material can be released for production."

29.     Agents who send any type of solicitation, including calls, texts, faxes, and emails, that violate New York Life's advertising policies can be fined, subject to disciplinary action, and terminated.

30.     Based on information and belief, all major life insurance carriers in the U.S., including, *inter alia*, Northwestern Mutual, MassMutual, Prudential, and State Farm, implement restrictions regarding their advertising policies, especially for their newer agents. Each of these carriers demands that some or all of their agents submit all marketing materials, including social media posts and profiles, to an internal compliance auditor for pre-screening. They further prohibit the use of third-party vendors or unaffiliated "bot" applications (software designed to repeatedly perform automated, pre-defined tasks) to make contact with business leads or customers.

### DreamSource

31.     Alberto Riehl is a former insurance agent. Prior to 2005, he was a registered retail insurance producer in Texas. Retail insurance producers are hired by insureds to procure insurance coverage appropriate for the risk being insured. They act as the agents of the insureds and, based upon their due diligence, pick the insurance product to be purchased by the insureds. They earn commissions by selling insurance plans.

32.     In 2002, Riehl was issued licenses to sell life insurance in California, Florida, Pennsylvania, and Ohio, under the name "Albert Riehl" and through MassMutual Ascend Life Insurance Company. His California and Florida licenses soon lapsed, his Pennsylvania license was suspended, and his Ohio license was revoked by order of the Insurance Commissioner in 2005. Also in 2005, Riehl was issued a license to sell real estate by the Hawaii Real Estate Commission. This license was suspended in 2008. In 2009, Riehl obtained an Insurance Producer license from the Insurance Division of the Hawaii Department of Commerce and Consumer Affairs. This license too was revoked in 2013.

33.     In or around 2016, while living in Laguna Niguel, California, Riehl formed the DreamSource Consulting limited liability corporation and filed registration paperwork for the company with the Nevada Secretary of State. All corporate documents were created under his wife's name. His wife, Sarah Davidian, remains its only officer. Riehl, however, is the face of the company, appearing in all its advertisements, Facebook and YouTube videos, and instructional materials.

34.     Since 2016, DreamSource has offered an online consulting program to life insurance agents that is "guaranteed" to generate leads. DreamSource markets and advertises the program, known as "the Predictable Premium System" (also referred to herein as the "Program"), on websites such as Facebook, LinkedIn, and YouTube.

35.     In nearly all its advertisements and marketing material, DreamSource touts these three primary benefits of the Program: (1) guaranteed lead generation; (2) approval from major insurance carriers; and (3) a money-back guarantee.  Since at least 2020 and on an ongoing basis, DreamSource has continually stated on its Facebook page and its website that, for approximately $6,000, customers can purchase and use the Program's "scientific process" to generate leads to enable agents to reach their premium targets as fast as possible; that the Program is a "formula," which when "applied correctly [] works 100% of the time"; that the Program is not just compatible with, but beloved by, large institutional carriers; that

the "largest insurance companies in the industry are flocking to us" and frequently named several carriers including Met Life, Prudential, State Farm, and New York Life; and that the Program is backed by a 100 percent money-back guarantee.

36.     Agents interested in the Program sign up online or send a message to the company via Facebook or YouTube asking for more information. After indicating their interest in the Program, the prospective customers are contacted by a DreamSource sales representative, usually by phone or email, after which the prospective customer completes paperwork to enroll in the Program and remits payment. Based on information and belief, all DreamSource sales representatives besides Alberto Riehl are either enrolled in or have completed the Program themselves.

37.     The Program is administered online. It consists of eight "lessons." The lessons require agents to follow specific marketing actions, such as updating their LinkedIn profiles to include particular language, using a scripted sales pitch during cold calls, using pre-recorded video advertisements, and using bots on social media sites like Facebook. In addition to the lessons, the Program offers one year of "live support" with its founder, Alberto Riehl. During these bi-weekly online sessions, agents are promised "1 on 1 time with Alberto Riehl to get all their questions answered." The live support is conducted in a group setting, so all participants can hear the other questions and answers. Finally, a "secret" Facebook group, to which the agents are added upon completing their orientation, offers another forum for questions and answers.

38.     The Program is described in its salespeople's LinkedIn profiles, which are all identical to one another and are scripted by Defendants, as an "amazing automated system" and "100% automated." "His very 1st FULLY... I mean, 100% Automated Life Insurance Appointment had just been booked!!!" and "We Help Agents & Advisors Get 8 Life Insurance Appointments a Day 100% Automated from Anywhere."

39.     DreamSource and Riehl have continuously and uniformly represented that the Program complies with all major life insurance carriers' marketing rules. Since at least 2020 and on an ongoing basis, DreamSource has continually stated on its Facebook page and its website that the Predictable Premium program has been successfully used by agents from all the major life insurance companies, including New York Life. In pre-sales communications with DreamSource representatives, including Kevin Knight and Mario Gamboa, Plaintiff and prospective customers directly asked whether the Program complied with their company's sales and marketing rules and DreamSource uniformly answered that it did. Defendants also marketed the Program using "testimonials" supposedly written by agents from New York Life, attesting to its success. In an "Ebook" titled "3%er Secrets," Riehl claims he has done:

> "full time consulting, training, and coaching for some of the largest insurance companies in the world – from State Farm Farmers and Allstate to Northwestern Mutual, Mass Mutual, New York Life Prudential, TransAmerica, Guardian, and a lot of independent brokers out there as well and all the major IMOs [independent marketing organizations] and FMOs [field marketing organizations]."

40.     DreamSource used the names of the major insurance companies such as New York Life, Met Life, Prudential, Allstate, State Farm, and Farmers in marketing videos and articles as well as promotional interviews with Riehl.[2] DreamSource and Riehl claimed that they have thousands of agents and advisors who were students of the program and that their method would work for all agents from any insurance company, big or small. They emphasized that the program was especially successful among New York Life agents. Representations on the DreamSource website include:

> We have from State Farm guys, and Allstate, and Farmers, and all those guys. They come to us for one reason, I need to get my life insurance sales up. We even have the Northwestern Mutual guys, and the

---

[2] *See* https://www.youtube.com/watch?v=YFn0up4rYYs.

MassMutual, and Prudential, and New York Life, and all those guys as well.

I see these big companies which today, we're very blessed. Every major company, we have every major company as a client, whether it's New York Life or Prudential or State Farm or Farmers. You can just list them all. They're clients today.

41.     As DreamSource and Riehl have worked in the life insurance industry for many years and have had many customers who have worked for major life insurance carriers, and based on Riehl's self-proclaimed training, coaching, and consulting experience with large carriers including NYL, they knew the above-described statements regarding the Program's compatibility with NYL and other large carriers were false at the time they made them. DreamSource and Riehl knew that it was important to potential customers to believe that the Program was compatible with their carriers' rules and so, despite the falsity of the statements, they made them anyway in order to induce potential customers to buy the Program.

## Predictable Premium Uses Advertising Strategies
## That Violate Carrier Policies

42.     In reality, almost none of the tactics peddled by the Predictable Premium program complied with insurance companies' rules.

43.     The Program called for agents to update their LinkedIn profiles with language that does not and cannot comply with the insurance industry marketing rules, including New York Life's.

44.     Lessons involved the use of bots, Facebook advertisements, virtual assistants, and various automated sales strategies, which violated insurance company rules prohibiting such marketing devices.

45.     After Plaintiff paid for the Program, he forwarded the program's scripted marketing materials to New York Life's compliance department for review, as required by company policy. New York Life's compliance department informed Plaintiff that he may not use any of the Predictable Premium materials because the

language violated its advertising restrictions. Moreover, Plaintiff was told he could not implement the many "100% automated" applications and strategies on which the Program was based.

46.    Numerous other customers of Predictable Premium were told the same. New York Life's compliance department informed one agent she would be subject to penalties if she used the Program's virtual assistant and telemarketing protocols. During one of the Program's weekly group Question & Answer phone calls with Riehl, the agent confronted Riehl with the compliance department's decision and Riehl responded that other New York Life agents are able to use all elements of the Program, including virtual assistants, without restriction. Based on his experience in the life insurance industry and direct experience with many NYL agents, Riehl knew this statement was false at the time but said it anyway in order to pacify the agent and avoid having her raise alarm bells with the other customers listening in during the call. The agent communicated Riehl's reassurance to a New York compliance manager, who responded "he has no idea what he's talking about."

47.    When confronted by other agents worried about running afoul of their companies' rules, Riehl brushed off the concerns, stating that he was well versed in all of the big companies' marketing rules and confirming that the Program was fully compliant with them. When pushed further, often by agents who had been reprimanded for violating their companies' rules or denied approval to implement one of the Program's strategies, Riehl used gaslighting tactics to try to shift the blame to the agents, accusing them of not trying hard enough. Other times, Riehl became hostile and banned the complaining agents from the Program altogether. In all instances, Riehl and DreamSource denied agents' requests for reimbursement, as it was their policy to do so.

48.    Because the Program violates carrier advertising restrictions, it is valueless to any agent working for New York Life or one of the other large insurance companies with restrictive advertising policies.

49.     The Program is a classic bait-and-switch scheme. Material information about the Program itself, the underlying lessons, and money-back guarantee were omitted by Riehl and by the Program's sales representatives and advertising materials and were not disclosed or made known to Plaintiff or members of the Classes prior to their purchase of and enrollment in the Program. Defendants falsely represented that the Program produces guaranteed success for agents of all life insurance companies in order to induce customers to pay a fee of nearly $6,000. Only after, with the agent's money in hand, were the Program's strategies revealed, in successive steps, each one violative of the agent's employer's established rules. Defendants also defrauded Plaintiff and the Classes about the availability of a money-back guarantee. Defendants induced Plaintiff and Class members to purchase the Program by promising to refund 100 percent of their purchase price if the Program did not produce the promised results. However, when Plaintiff and Class members requested their money be refunded, Defendants refused to honor that promise.

50.     Plaintiff and the Classes had no way of knowing that the Program's strategies would be unusable until after they had already paid Defendants. Defendants' promise of guaranteed lead generation was highly enticing to life insurance agents, including Plaintiff and members of the Classes, looking to meet their quotas. Defendants' promise of a money-back guarantee made the Program (and its steep price tag) appear to be a risk-free experiment. From the perspective of Plaintiff and the Classes, if the Program worked, they would reap the promised benefits. If it did not work, they could get their money back and be no worse off. As a result, Plaintiff and the Classes relied on Defendants' material promises, representations, and guarantees to their detriment by paying the nearly $6,000 Program tuition as well as additional service and subscription fees required as part of the Program.

51.     Defendants monitored customer review websites and deleted or sought the removal of any negative comments about the Program and stifled the concerns of agents who complained about the Program by threatening legal action.

52.     In addition to the bait-and-switch scheme that generated nearly $6,000 per victim, Defendants operate a fraudulent venture to amass recruits to sell the Program, pyramid-style, creating even more opportunities for Defendants to profit from a worthless product. Riehl and other sales representatives seek to convert the customer-agents who complete the Program into "consultants" for the Program itself—that is, to train the agent on how to sell Predictable Premium to other agents so that Defendants may capture more paying customers. There are countless videos on YouTube from supposed customers of the Program touting its benefits. While these might appear to be satisfied customer reviews, they are actually part of the Program itself, scripted and dictated by Defendants in order to leverage paying customers into more paying customers.

53.     Despite Defendants' efforts to conceal the truth about Predictable Premium and suppress criticism from agents, at least one online forum, insurance-forums.com, has a thread related to the Program and Riehl that spans back to 2016. From 2016 to the present, agents have posted dozens of messages to this forum recounting stories of being conned and scammed by Riehl, often through an aggressive sales and marketing strategy identical to that described herein followed by across-the-board denials of refund requests.

54.     Riehl has routinely threatened those who criticize his business or demand refunds with threats of legal action. He frequently tells unsatisfied customers that his "legal team" will come after them if they report the many misrepresentations in DreamSource's materials. In at least one instance, Riehl threatened to file complaints with insurance companies, apparently to prevent an agent from finding work, if they filed a formal complaint against him.

1
2
3
4
5



6
7
8
9
10
11
12
13
14
15
16
17
18
19

55.     Plaintiff has worked as a life insurance agent for New York Life since approximately 2013. In 2021, he saw online advertisements for Predictable Premium, including on YouTube and Facebook, which guaranteed lead generation and boasted a track record of success by agents with all the major insurance companies, including New York Life. He also saw Defendants' promise of a money-back guarantee if the Program did not work. Relying on these representations, Plaintiff engaged in communications with a DreamSource sales representative to learn more about the program. In connection with these communications, Plaintiff provided DreamSource information about his current job and employer. Plaintiff specifically inquired as to whether the Program would work for New York Life agents. The DreamSource representative, Mario Gamboa, who was located in California, confirmed that it did. Plaintiff enrolled in the program and paid approximately $5,800 to Defendants. At no time prior to this purchase was Plaintiff given any detail about the Program's specific strategies.

20
21
22
23
24
25
26

56.     After the initial lessons, Plaintiff realized that the Program's lead-generating strategies violated New York Life's rules. In accordance with New York Life's policies, Plaintiff submitted to the New York Life compliance department the language provided in the Program for use in social networking site advertisements. New York Life compliance denied his request to use the language. Continuing to follow the Program's lessons, Plaintiff made videos to use in Facebook ads but, again, New York Life compliance denied his request to use them.

27
28

57.     Plaintiff relayed these events to Defendants through various communications, including directly to Alberto Riehl in a live support call. Riehl told Plaintiff that

getting approval from his company was not part of the Program and told Plaintiff to proceed according to the Program's instructions. Believing there was an exception or work-around he was not aware of, but Defendants were, Plaintiff followed Defendants' instructions.

58.     Subsequently, Plaintiff reviewed the New York Life rules, which clearly prohibited the strategies in the Program's lessons. Plaintiff again contacted Riehl in a live support call, explaining the conflict between the Program's strategies and New York Life's rules and, this time, requested a refund. Riehl maintained that the Program's strategies were fully compliant but suggested that Plaintiff should hire an assistant. Plaintiff again requested a refund, as hiring an assistant was not consistent with the Program's promise of automatic lead generation. At that point, Riehl muted Plaintiff's phone line for the remainder of the live support session.

59.     After Plaintiff's multiple public requests for a refund, Defendants terminated Plaintiff's access to the Program's online platform and other Program-related outlets. Riehl threatened to report Plaintiff to New York Life's compliance department. Plaintiff was never issued any refund.

60.     In addition to the fee he paid for the Program, Plaintiff also incurred out of pocket expenses in the form of additional fees paid to various online subscriptions required by the Program including a DreamSource-related LinkedIn program ($99 per month) and other paid-for services through companies called Active Campaign and Clickfunnels.

61.     As a proximate result of Defendants' conduct, Plaintiff suffered injuries including but not limited to out-of-pocket damages, lost time, stress, and anxiety.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

63.     Plaintiff brings this class action to seek relief on behalf of himself and the following Refund Class:

**The Refund Class**: All individuals who purchased the Predictable Premium Program at any time between April 24, 2017 to the present and who made a request for a refund that was denied.

64.     Plaintiff also brings this action on behalf of the following New Jersey Refund Subclass:

**The New Jersey Refund Subclass**: All members of the Refund Class who, at the time of their purchase, resided in New Jersey.

Plaintiff will amend this complaint to add other State Subclasses, if appropriate, upon discovery of facts substantiating the addition of such subclasses.

65.     Plaintiff also brings this action on behalf of the following NYL Compliance Class:

**The NYL Compliance Class**: All individuals who purchased the Predictable Premium Program at any time between April 24, 2017 to the present and who, at the time of their purchase, worked for New York Life Insurance Company.

Plaintiff will amend this complaint to add other Compliance Subclasses comprised of agents of other carriers, if appropriate, upon discovery of facts substantiating the addition of such subclasses.

66.     Plaintiff also brings this action on behalf of the following New Jersey NYL Compliance Subclass:

**The New Jersey NYL Compliance Subclass**: All members of the NYL Compliance Class who, at the time of their purchase, resided in New Jersey.

Plaintiff will amend this complaint to add other State Subclasses, if appropriate, upon discovery of facts substantiating the addition of such subclasses.

67.     Plaintiff reserves the right to amend the above definitions of the Classes and Subclasses if discovery or further investigation demonstrate that they should be expanded or otherwise modified.

68.     The members of the Classes are so numerous, counting no less than 600 persons, that joinder of all members would be impracticable.

CLASS ACTION COMPLAINT FOR DAMAGES AND RELIEF AND DEMAND FOR JURY TRIAL

69.     There are questions of law and fact common to the members of the Classes and Subclasses that predominate over any questions affecting only individual members, including:

a.  Whether Defendants' statements and representations regarding the Predictable Premium Program (including its money-back guarantee and compatibility and compliance with New York Life's rules) were false and misleading;

b.  Whether Defendants concealed material information regarding the Predictable Premium Program;

c.  Whether Defendants knew the falsity of the misrepresentations at the time they were made;

d.  Whether Defendants' misrepresentations were material to the Classes and Subclasses in considering the Predictable Premium Program;

e.  Whether Defendants' intended to induce members of the Classes and Subclasses to rely on their misrepresentations regarding the Predictable Premium Program;

f.  Whether Defendants negligently misrepresented the Predictable Premium Program to Plaintiff and members of the Classes and Subclasses;

g.  Whether Defendants' misrepresentations played a substantial and material part in influencing the course of action of members of the Classes and Subclasses to pay for the Predictable Premium Program;

h.  Whether Defendants' misrepresentations caused damages to members of the Classes and Subclasses;

i.  The nature and quantity of damages suffered by members of the Classes and Subclasses;

j.  Whether Defendants were unjustly enriched by their conduct;

k.  Whether Defendants' conduct constituted unfair competition under California law;

l.  Whether Defendants' conduct constituted false advertising under California law;

m. Whether Defendants' conduct constituted deceptive trade practices under Nevada law; and

n.  Whether Defendants' conduct violated New Jersey's Consumer Fraud Act.

70.  Plaintiff's claims are typical of the claims of the Classes and Subclasses. Plaintiff has no interests antagonistic to those of the Classes and Subclasses and is not subject to any unique defenses.

71.  Plaintiff will fairly and adequately protect the interests of the Classes and Subclasses and has retained attorneys experienced in class action and complex litigation.

72.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons:

a.  It is economically impractical for members of the Classes and Subclasses to prosecute individual actions;

b.  The Classes and Subclasses are readily ascertainable and definable;

c.  Prosecution as a class action will eliminate the possibility of repetitious litigation; and

d.  A class action will enable claims to be handled in an orderly and expeditious manner, will save time and expense, and will ensure uniformity of decisions.

73.  Adequate notice of this action may be made by mail or email using the information in Defendants' books and records.

74.  Plaintiff does not anticipate any difficulty in the management of this litigation.

## CAUSES OF ACTION

### First Cause of Action

### Fraud

### [On behalf of Refund Class and NYL Compliance Class]

75.     Plaintiff realleges and incorporates the above allegations by reference as if set forth fully herein.

76.     Plaintiff brings this cause of action on behalf of himself, the Refund Class, and the NYL Compliance Class.

77.     Defendants engaged in intentional misrepresentations. Defendants made numerous material misrepresentations to Plaintiff and the Classes about the Predictable Premium Program.

78.     **With respect to the Refund Class:** Defendants represented to Plaintiff and the Refund Class that the Predictable Premium Program was backed by a 100 percent money-back guarantee. This statement was false. Defendants omitted any mention that Defendants had a policy to uniformly reject all refund requests. Defendants also omitted that they would prohibit customers from accessing the Program completely if they pursued their request for a refund. In doing so, Defendants misrepresented material facts regarding the Program's nature, purpose, value, and risk. Plaintiff and the Refund Class relied on these misrepresentations to their detriment. The purported risk-free nature of the Program was a material aspect to Plaintiffs and the Refund Class. Had they known there was no guaranteed right to recover their money if the Program turned out to be ineffective, they would not have purchased it.

79.     **With respect to the NYL Compliance Class:** Defendants represented Plaintiff and the NYL Compliance Class that the Predictable Premium Program was guaranteed to generate automated leads for agents of all life insurance companies, that the Program was compatible with all large institutional carriers including New York Life, and that the Program complied with all major life insurance carrier's marketing rules, including New York Life's. These were representations of fact and

were uniformly and objectively false. Defendants omitted any mention that the Predictable Premium Program was, in fact, not compliant with NYL's rules and that adhering to the Program could result in disciplinary action by NYL for violating its rules. In doing so, Defendants misrepresented material facts regarding the Program's nature, purpose, value, and risk. These omissions rendered Defendants' affirmative representations deceptive and likely to mislead. These facts were known or accessible only to Defendants, who knew they were not known to or reasonably discoverable by Plaintiff and the Class. Prior to purchasing the Program, Plaintiff and the Class had no knowledge of the details of the Program and what would be required by the various steps. As such, they had no way of determining whether it complied with NYL's rules. Defendants were in sole possession of this information.

80.     Defendants knew these representations were false when they made them or knew they did not have sufficient information to make the representations. With respect to Defendants' representations as to the Program's compatibility with NYL's rules, Defendants knew, based on prior experience in the insurance industry and based on complaints directed to them made by prior customers, that the Program did not and could not comply with NYL's rules.

81.     Defendants intended to induce Plaintiff and members of the Classes to rely on the information and act on it accordingly by purchasing the Program in order to generate revenue for Defendants. Unaware of the falsity of the representations, Plaintiff and members of the Classes relied on these misrepresentations by purchasing the Program for approximately $6,000.

82.     By making the above-described false representations regarding the Program's guaranteed results, money back guarantee, and compatibility with NYL and other major carriers, Defendants made false promises to Plaintiff and the Classes as to material facts regarding the Program's nature, purpose, value, and risk. Defendants promised a 100 percent money back guarantee that they knew they would not provide based on their own policy of denying customer refunds. Defendants

promised the Program was compatible with NYL rules but knew this promise was false based on their own prior experience working in the insurance industry and based on prior complaints from other customers who informed them of the Program's incompatibility with NYL and other major carriers' advertising policies. Defendants knew these promises would be material to potential customers and made them with the intent of inducing Plaintiff and members of the Classes to rely on them and purchase the Program. Plaintiff and members of the Classes were unaware of Defendants' intention not to perform the promises. Plaintiff and members of the Class acted in reliance on the promises by purchasing the Program for approximately $6,000.

83.     By making the above-described false representations, Defendants also concealed and failed to disclose information that they had a duty to disclose. Defendants were under a duty to disclose all material information that would be necessary to Plaintiffs to understand the nature the Program, including Defendants' policy against refunding money to dissatisfied customers and the Program's incompatibility with NYL policies. Defendants concealed or failed to disclose these material facts—namely that they would not honor the 100 percent money-back guarantee and that the Program violated NYL's rules. Defendants had a special relationship with Plaintiff and members of the Classes based on the fact Plaintiff and members of the Classes put their confidence in Defendants because of their position, experience or knowledge, and Defendants were aware Plaintiffs and members of the Classes were giving that confidence. Because of the special relationship, Defendants were under a duty to disclose these facts to Plaintiff and members of the Classes because they knew that, by concealing them, Plaintiffs and the Classes would be defrauded. Defendants intended to induce Plaintiff and members of the Classes to act in a manner different than they would have had they known the truth. Plaintiff and members of the Class were unaware that Defendants would not honor the

money-back guarantee or that the Program violated NYL's rules and would not have acted as they did if they had known those facts.

84.     Plaintiff and members of the Classes reasonably and justifiably relied on Defendants' false representations, false promises, concealments, and omissions described above. The representations false promises, concealments, and omissions played a substantial and material part in influencing the course of action of Plaintiff and members of the Classes took in purchasing the Predictable Premium Program.

85.     As a direct and proximate cause of Defendants' fraudulent misrepresentations, false promises, concealments, and omissions, Plaintiff and members of the Classes were damaged in an amount to be proven at trial.

## **Second Cause of Action**

### **Negligent Misrepresentation**

### **[On behalf of Refund Class and NYL Compliance Class]**

86.     Plaintiff realleges and incorporates the above allegations by reference as if set forth fully herein.

87.     Plaintiff brings this cause of action on behalf of himself, the Refund Class, and the NYL Compliance Class.

88.     **With respect to the Refund Class:** Defendants represented to Plaintiff and the Refund Class that the Predictable Premium Program was backed by a 100 percent money-back guarantee. This statement was false. Defendants omitted any mention that refund requests would uniformly be rejected at Defendants' discretion. Defendants also omitted that they would prohibit customers from accessing the Program completely if they pursued their request for a refund. In doing so, Defendants misrepresented material facts regarding the Program's nature, purpose, value, and risk. Plaintiff and the Refund Class relied on these misrepresentations to their detriment. The purported risk-free nature of the Program was a material aspect to Plaintiffs and the Refund Class. Had they known there was no guaranteed right to

recover their money if the Program turned out to be ineffective, they would not have purchased it.

89.    **With respect to the NYL Compliance Class:** Defendants misrepresented Plaintiff and the NYL Compliance Class that the Predictable Premium Program was guaranteed to generate automated leads for agents of all life insurance companies, that the Program was compatible with all large institutional carriers including New York Life, and that the Program complied with all major life insurance carrier's marketing rules, including New York Life's. These were representations of fact and were uniformly and objectively false. Defendants omitted any mention that the Predictable Premium Program was, in fact, not compliant with NYL's rules and that adhering to the Program could result in disciplinary action by NYL for violating its rules. In doing so, Defendants misrepresented material facts regarding the Program's nature, purpose, value, and risk. These omissions rendered Defendants' affirmative representations deceptive and likely to mislead. These facts were known or accessible only to Defendants, who knew they were not known to or reasonably discoverable by Plaintiff and the Class. Prior to purchasing the Program, Plaintiff and the Class had no knowledge of the details of the Program and what would be required by the various steps. As such, they had no way of knowing whether it complied with NYL's rules. Defendants were in sole possession of this information.

90.    Defendants had no reasonable grounds for believing the misleading statements described above were true at the time they were made. Defendants failed to conduct reasonable and diligent investigation of the representations they made to Plaintiff and the Classes to ensure those statements were true. Defendants' policy against refunding customer funds was known to Defendants as it was their own policy. Many of NYL's rules were publicly available and could be viewed online and could be confirmed by consulting with NYL compliance personnel. Defendants, in the exercise of reasonable care, should have known that their statements and omissions were misleading, including because Defendants knew or should have

known that (1) they would not issue refunds as promised; and (2) because Defendants knew or should have known that the Program did not comply with NYL's rules.

91.    Defendants each owed a duty to Plaintiff and members of the Classes to speak with care and explain fully and truthfully all material facts regarding the Program. This duty arose from several bases. Defendants' duty arose under the UCL, FAL, Nevada's Deceptive Trade Practices Act, and New Jersey's Consumer Fraud Act, which prohibit deceptive acts or practices affecting consumer commerce. This includes material representations, omissions, or practices that are likely to mislead a reasonable consumer. Additionally, DreamSource's duty to disclose arose from its privity relationship with Plaintiff and the Classes.

92.    The above-described relationship between Defendants and Plaintiff was such that, in morals and good conscience, Plaintiff and the Classes had the right to rely upon Defendants for information. Defendants were in a special position of confidence and trust with Plaintiff and the Class such that their reliance on Defendants' negligent misrepresentations was justified.

93.    Defendants knew, or reasonably should have known, that Plaintiff and the Classes would rely on their misrepresentations and omissions in purchasing the Predictable Premium Program. Defendants knew that it was the sole source of information about the Program and knew that Plaintiff and the Classes would therefore rely on its representations.

94.    The negligent misrepresentations and omissions made by Defendants, upon which Plaintiff and members of the Classes reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiff and members of the Classes members to purchase the Predictable Premium Program.

95.    As a direct and proximate cause of their reliance on Defendants' representations, Plaintiff and the members of the Classes have been injured as described herein and are entitled to damages in an amount to be proven at trial.

### Third Cause of Action

### Unjust Enrichment

### [On behalf of Refund Class and NYL Compliance Class]

96.     Plaintiff realleges and incorporates the above allegations by reference as if set forth fully herein.

97.     Plaintiff brings this cause of action on behalf of himself, the Refund Class, and the NYL Compliance Class.

98.     Plaintiff and members of the Classes conferred a monetary benefit on Defendants by each paying Defendants approximately $6,000 on the promise that Defendants would provide, in exchange, a lead generation program guaranteed to deliver automated leads, backed by a 100 percent money-back guarantee, and compliant with all major insurance carriers' marketing rules, including NYL's rules.

99.     Defendants enriched themselves by receiving, retaining, and appropriating Plaintiff and the Classes' money but failing to deliver the Program as advertised. With respect to the Refund Class, Defendants provided a Program that did not generate automated leads and was not backed by a 100 percent money-back guarantee. Relying on the purported money-back guarantee, Plaintiff and the Refund Class requested refunds of their tuition payments. However, rather than refunding Plaintiff and the Class, Defendants refused to honor the money-back guarantee. Plaintiff and the Class, therefore, did not receive the benefit of the bargain and Defendants unjustly retained Plaintiff and the Class's funds. With respect to the NYL Compliance Class, Defendants provided a Program that was not compliant with NYL's rules. Plaintiff and the Class were unable to use the Program without running afoul of NYL's rules. It was, therefore, valueless to them, however, Defendants unjustly retained Plaintiff and the Class's funds.

100.    Under the principles of equity and good conscience, Defendants should not be permitted to retain Plaintiff's and the Classes' money, because Defendants have not provided the promised program in exchange.

101.   Defendants acquired the monetary benefit through inequitable means, in that they used deceptive, fraudulent, and misleading conduct to induce Plaintiff and members of the Classes to pay them for the Program. Defendants are, therefore, conscious wrongdoers.

102.   If Plaintiff and members of the Classes knew that Defendants would not provide the Program as promised, they would not have agreed to remit their tuition payments of approximately $6,000.

103.   Defendants accepted and retained the monetary benefits conferred upon them by Plaintiff and members of the Classes under circumstances indicating Defendants would provide a valuable and risk-free lead-generation program guaranteed to deliver results, backed by a 100 percent money-back guarantee, and compliant with all major insurance carriers' marketing rules, including NYL's rules. Defendants have not provided the promised program. It would, therefore, be inequitable and unjust for Defendants to retain such benefit without repayment of the value thereof.

104.   As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Classes have suffered and will suffer injury, including but not limited to the loss of their purchase payments of approximately $6,000 and other monies spent in conjunction with implementing the Program's strategies.

105.   Defendants should be compelled to disgorge all proceeds that they unjustly received from Plaintiff and members of the Classes.

**Fourth Cause of Action**

**Violation of the Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200**

**[On behalf of Refund Class and NYL Compliance Class]**

106.   Plaintiff realleges and incorporates the above allegations by reference as if set forth fully herein.

107.   Plaintiff brings this cause of action on behalf of himself, the Refund Class, and the NYL Compliance Class.

CLASS ACTION COMPLAINT FOR DAMAGES AND RELIEF AND DEMAND FOR JURY TRIAL

108.   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200, et seq.

109.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute business acts and practices.

110.   **With respect to the Refund Class:** Defendants represented to Plaintiff and the Refund Class that the Predictable Premium Program was backed by a 100 percent money-back guarantee. This statement was false. Defendants omitted any mention that refund requests would uniformly be rejected at Defendants' discretion. Defendants also omitted that they would prohibit customers from accessing the Program completely if they pursued their request for a refund. In doing so, Defendants misrepresented material facts regarding the Program's nature, purpose, value, and risk. Plaintiff and the Refund Class relied on these misrepresentations to their detriment. The purported risk-free nature of the Program was a material aspect to Plaintiffs and the Refund Class. Had they known there was no guaranteed right to recover their money if the Program turned out to be ineffective, they would not have purchased it.

111.   **With respect to the NYL Compliance Class:** Defendants misrepresented Plaintiff and the NYL Compliance Class that the Predictable Premium Program was guaranteed to generate automated leads for agents of all life insurance companies, that the Program was compatible with all large institutional carriers including New York Life, and that the Program complied with all major life insurance carrier's marketing rules, including New York Life's. These were representations of fact and were uniformly and objectively false. Defendants omitted any mention that the Predictable Premium Program was, in fact, not compliant with NYL's rules and that adhering to the Program could result in disciplinary action by NYL for violating its rules. In doing so, Defendants misrepresented material facts regarding the Program's nature, purpose, value, and risk. These omissions rendered Defendants' affirmative representations deceptive and likely to mislead. These facts were known or

accessible only to Defendants, who knew they were not known to or reasonably discoverable by Plaintiff and the Class. Prior to purchasing the Program, Plaintiff and the Class had no knowledge of the details of the Program and what would be required by the various steps. As such, they had no way of knowing whether it complied with NYL's rules. Defendants were in sole possession of this information.

112.    **Unlawful**: The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

- California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* (as alleged below)

- Nevada's Deceptive Trade Practices Act, Nev. Rev. St. §§ 598.0901, *et seq.* ("NDTPA") (as alleged below)

- New Jersey's Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* ("NJCFA") (as alleged below)

- California, Nevada, and New Jersey common law for fraud, negligent misrepresentation, and unjust enrichment (as alleged above)

113.    **Unfair**: Defendants' conduct with respect to the labeling, advertising, and sale of the Predictable Premium Program and their denial of refund requests was "unfair" because Defendants' deceptive and dishonest conduct in the marketplace was immoral, unethical, unscrupulous, or substantially injurious to Plaintiff and members of the Classes and the utility of Defendants' conduct, if any, does not outweigh the gravity of the harm to their victims.

114.    Defendants' conduct with respect to the labeling, advertising, and sale of the Predictable Premium Program and their denial of refund requests was and is also unfair because it violates public policy as declared by specific statutory provisions including but not limited to the above cited statutes.

115.    Defendants' conduct with respect to the labeling, advertising, and sale of the Predictable Premium Program and their denial of refund requests was and is unfair because the injury was substantial, not outweighed by benefits to competition, and not one that Plaintiff or members of the Classes could reasonably have avoided.

116. **Fraudulent**: A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test.

117. As set forth herein, Defendants' representations regarding the Predictable Premium Program are likely to mislead reasonable consumers to believe Defendants' claims and promises relating to the Predictable Premium Program are true.

118. Defendants profited from the sale of the falsely, deceptively, and unlawfully advertised Predictable Premium Program.

119. Defendants' conduct caused and continues to cause substantial injury to Plaintiff and the members of the Classes. Defendants continue to publish misleading claims about the Predictable Premium Program and continue to deny refund requests. Plaintiff has suffered injury in fact as a result of Defendants' unlawful, unfair, and fraudulent conduct.

120. In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices.

121. Plaintiff and the Classes also seek an order for and restitution of all monies from the sale of the Predictable Premium Program, which were unjustly acquired through acts of unlawful competition, and any other relief allowed under the UCL, including interest and attorneys' fees pursuant to, *inter alia*, Code of Civil Procedure § 1021.5, and to such other and further relief as this Court may deem just and proper.

### Fifth Cause of Action

### Violation of the False Advertising Law

### Cal. Bus. & Prof. Code § 17500

### [On behalf of Refund Class and NYL Compliance Class]

122. Plaintiff realleges and incorporates the above allegations by reference as if set forth fully herein.

123.   Plaintiff brings this cause of action on behalf of himself, the Refund Class, and the NYL Compliance Class.

124.   A substantial amount of the conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of California Business and Professions Code §§ 17500, *et seq.*

125.   California Business and Professions Code §§ 17500, *et seq.* prohibits deceptive or misleading practices in connection with advertising or representations made for the purpose of inducing, or which are likely to induce, consumers to purchase products.

126.   It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

127.   Defendants violated the FAL when they marketed, advertised, and promoted the Predictable Premium Program by: (1) misleading Plaintiffs and Class members about the benefits of the Program, (2) omitting material facts about the compatibility of the Program with NYL's rules, and (3) omitting material facts about the Program's purported money-back guarantee.

128.   Defendants knew these representations were false when they made them or knew they did not have sufficient information to make the representations. With respect to Defendants' representations as to the Program's compatibility with NYL's rules, Defendants either (1) knew what NYL's rules were, in which case they knew the Program did not and could not comply, or (2) they did not know the specifics of NYL's rules, in which case Defendants were reckless in representing the Program complied with them in the absence of such information. With respect to Defendants' misrepresentations and omissions regarding the Program's guaranteed results and money-back guarantee, Defendants were either aware that the Program did not have such benefits, or they were aware that they lacked the information and knowledge required to truthfully make these representations.

129.   Plaintiff has standing to pursue claims under the FAL because he reasonably reviewed and relied on Defendants' statements when purchasing the Predictable Premium Program.

130.   In reliance on the statements made in Defendants' advertising and marketing materials and Defendants' omissions and concealment of material facts regarding the quality and characteristics of the Program, Plaintiff and members of the Classes purchased the Program.

131.   Had Defendants disclosed the true nature and characteristics of the Program, Plaintiff and members of the Classes would not have purchased the Program.

132.   As a direct and proximate result of Defendants' actions, as set forth herein, Plaintiff suffered injury in fact, and lost money or property including but not limited to economic loss and lost time dedicated to the investigation of and attempt to obtain a refund.

133.   Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of himself, the Refund Class, and the NYL Compliance Class, seeks an order enjoining Defendants from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

134.   Plaintiffs seek an order of this Court awarding restitution and injunctive relief and all other relief allowed under the FAL, including interest and attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5, and to such other and further relief as this Court may deem just and proper.

### Sixth Cause of Action

### Violation of Nevada's Deceptive Trade Practices Act

### NRS 41.600 & NRS Chapter 598

### [On behalf of Refund Class and NYL Compliance Class]

135.   Plaintiff incorporates the above allegations by reference as if set forth fully herein.

136.   Plaintiff brings this cause of action on behalf of himself, the Refund Class, and the NYL Compliance Class.

137.   Pursuant to Nev. Rev. Stat. § 41.600(2)(e), "[a]n action may be brought by any person who is a victim of consumer fraud. As used in this section, 'consumer fraud' means … [a] deceptive trade practice as defined by NRS 598.0915 to 598.00925, inclusive," also known as Nevada's Deceptive Trade Practices Act ("NDTPA").

138.   Defendants engaged in deceptive trade practices under the NDTPA based on the conduct described herein, and specifically in the following ways:

    a.   Under NRS 598.0915(2), Defendants knowingly made false representations as to the source, sponsorship, approval or certification of a good or service by representing that the Program and its strategies were approved (or sure to be approved) by NYL and compliant with NYL's internal rules when in fact the Program and its strategies were not approved by NYL nor compliant with its rules;

    b.   Under NRS 598.0915(5), Defendants knowingly made false representations as to the characteristics, uses, benefits, and qualities of a good or service by (1) representing that the Program and its strategies were approved (or sure to be approved) by NYL and compliant with NYL's internal rules when in fact the Program and its strategies were not approved by NYL nor compliant with its rules; and (2) by advertising, but not honoring, a 100 percent money back guarantee for the Program;

    c.   Under NRS 598.0915(7), Defendants knowingly misrepresented the standard and quality of a good or service by representing that the Program and its strategies were approved (or sure to be approved) by NYL and compliant with NYL's internal rules when in fact the Program and its strategies were not approved by NYL nor compliant with its rules;

d. Under NRS 598.0915(8), Defendants knowingly disparaged the services and business of Plaintiff and members of the NYL Compliance Class through false or misleading representations of fact because, when the Program proved useless for those individuals, Defendants blamed them for a personal failure to implement the Program and its strategies when, in reality, the Program did not work because it was not sanctioned by NYL and therefore it lacked any possibility of efficacy whatsoever;

e. Under NRS 598.0915(9), Defendants knowingly advertised goods or services with intent not to sell them as advertised by (1) purposefully misrepresenting that the Program and its strategies were approved (or sure to be approved) by NYL and compliant with NYL's internal rules when in fact the Program and its strategies were not approved by NYL nor compliant with its rules; and (2) by advertising, but not honoring, a 100 percent money back guarantee for the Program;

f. Under NRS 598.0915(15), Defendants knowingly made false representations in the transactions involving the Program, including by accepting payment for the Program after having misrepresented the Program as compliant with the internal rules used by any insurance company, including NYL, and by advertising, but not honoring, the Program's advertised 100 percent money back guarantee;

g. Under NRS 598.092(8), Defendants knowingly misrepresented the legal rights, obligations or remedies of a party to a transaction, including by advertising, but not honoring, a 100 percent money back guarantee for the Program; and

h. Under NRS 598.0923(1)(b), Defendants failed to disclose a material fact in connection with the sale of goods or services by concealing (1) that the Program and its strategies were not sanctioned by any life insurance

company including NYL; and (2) Defendants would rarely, if ever, honor the advertised 100 percent money back guarantee.

139.   Plaintiff and the Classes have suffered injuries, including lost time and money, as a direct and proximate cause of Defendants' deceptive trade practices.  Absent Defendants' deceptive trade practices, Plaintiff and the Classes would not have purchased the Program or would have paid substantially less for it.  The harm to Plaintiff and the Class members outweighs any legitimate justifications or motives for engaging in such conduct.

140.   The statements and representations made by Defendants were made for the benefit of the reputation and revenue of Defendants and to induce, directly or indirectly, others to purchase the services of and enter into a business relationship with Defendants.

141.   Defendants' conduct was a cause and a substantial factor in bringing about Plaintiff's harm and Plaintiff seeks damages in law for the harm caused, including Plaintiff's litigation costs and reasonable attorneys' fees as allowed under NRS 41.600(3), which exceed $15,000.

142.   Plaintiff and the Classes seek an order enjoining Defendants from continuing their deceptive practices. Plaintiff and the Classes further seek a refund of all monies paid to Defendants for the Predictable Premium Program, as well as all damages, interest, attorneys' fees, and fees and costs allowable under Nevada law and the NDTPA.

<u>**Seventh Cause of Action**</u>

**Violation of New Jersey's Consumer Fraud Act**

**(N.J. Stat. Ann. §§ 56:8-1 *et seq.*)**

**[On behalf of the New Jersey Refund Subclass and New Jersey NYL Compliance Subclass]**

143.   Plaintiff realleges and incorporates the above allegations by reference as if set forth fully herein.

144.   Plaintiff brings this cause of action on behalf of himself, the New Jersey Refund Subclass, and the New Jersey NYL Compliance Subclass.

145.   By engaging in the conduct described above with Plaintiff within the state of New Jersey, Defendants committed consumer fraud and violated New Jersey's Consumer Fraud Act (the "NJCFA").

146.   By engaging in the conduct described above, Defendants used, by means of affirmative acts, unconscionable commercial practices, deception, fraud, false pretenses, false promises, and misrepresentations in connection with the sale and advertisement of the Predictable Premium Program.

147.   Specifically, Defendants advertised and marketed the Program and its strategies on the promise that they were approved (or sure to be approved) by NYL and compliant with NYL's internal rules when in fact the Program and its strategies were not approved by NYL nor compliant with its rules. This is a material fact since if they knew the Program did not comply with NYL's rules, Plaintiff and members of the New Jersey NYL Compliance Subclass never have purchased it. Defendant also advertised and marketed the Program and its strategies on the promise that it was backed by a 100 percent money back guarantee when in fact Defendants refused to honor refund requests at their discretion. This is also a material fact as Plaintiff and members of the New Jersey Refund Subclass would not have purchased the Program had they known that refund requests would not be honored.

148.   **With respect to the New Jersey Refund Subclass:** Defendants advertised and marketed the Predictable Premium Program as backed by a 100 percent money-back guarantee. This statement was false. Defendants omitted any mention that refund requests would uniformly be rejected at Defendants' discretion. Defendants also omitted that they would prohibit customers from accessing the Program completely if they pursued their request for a refund. In doing so, Defendants misrepresented material facts regarding the Program's nature, purpose, value, and risk. Plaintiff and the New Jersey Refund Subclass relied on these misrepresentations

to their detriment. The purported risk-free nature of the Program was a material aspect to Plaintiffs and the New Jersey Refund Subclass. Had they known there was no guaranteed right to recover their money if the Program turned out to be ineffective, they would not have purchased it.

149.   **With respect to the New Jersey NYL Compliance Subclass:** Defendants advertised and marketed the Predictable Premium Program as being guaranteed to generate automated leads for agents of all life insurance companies, that the Program was compatible with all large institutional carriers including NYL, and that the Program complied with all major life insurance carrier's marketing rules, including NYL's. These were representations of fact and were uniformly and objectively false. Defendants omitted any mention that the Predictable Premium Program was, in fact, not compliant with NYL's rules and that adhering to the Program could result in disciplinary action by NYL for violating its rules. In doing so, Defendants misrepresented material facts regarding the Program's nature, purpose, value, and risk. These omissions rendered Defendants' affirmative representations deceptive and likely to mislead. These facts were known or accessible only to Defendants, who knew they were not known to or reasonably discoverable by Plaintiff and the New Jersey NYL Compliance Subclass. Prior to purchasing the Program, Plaintiff and the New Jersey NYL Compliance Subclass had no knowledge of the details of the Program and what would be required by the various steps. As such, they had no way of determining whether it complied with NYL's rules. Defendants were in sole possession of this information.

150.   Defendants knew these representations were false when they made them or knew they did not have sufficient information to make the representations. With respect to Defendants' representations as to the Program's compatibility with NYL's rules, Defendants either (1) knew what NYL's rules were, in which case they knew the Program did not and could not comply, or (2) they did not know the specifics of

NYL's rules, in which case Defendants were reckless in representing the Program complied with them in the absence of such information.

151.   These affirmative acts had the potential to mislead and deceive when they were performed and, in fact, did mislead and deceive Plaintiff and the Subclasses. Unaware of the falsity of the representations, Plaintiff and members of the Subclasses relied on these misrepresentations by purchasing the Program for approximately $6,000. As such, Defendants committed unlawful practices pursuant to the NJCFA. N.J. Stat. Ann. §§ 56.8-2.

152.   By engaging in the conduct described above, Defendants knowingly concealed, suppressed, and omitted material facts with the intent that Plaintiff and the Subclasses rely upon such concealment, suppression, and omission in connection with the sale and advertisement of the Predictable Premium program. As such, Defendants committed unlawful practices pursuant to the CFA. N.J. Stat. Ann. §§ 56.8-2.

153.   Defendants also advertised the Predictable Premium program as part of a plan or scheme not to sell the service as advertised. As such, Defendants committed unlawful practices pursuant to the CFA. N.J. Stat. Ann. §§ 56.8-2.2.

154.   Defendants' representations regarding the Predictable Premium program described above constitute "advertisements" as defined by N.J. Stat. Ann. § 56.8-1(a).

155.   The Predictable Premium program constitutes "merchandise" as defined by N.J. Stat. Ann. § 56.8-1(c), as it is a good, commodity, or service offered to the public for sale.

156.   Plaintiff and the Subclass members are "persons" as defined by N.J. Stat. Ann. § 56.8-1(d).

157.   The transactions by which Plaintiffs and the Subclass members purchased or subscribed to the Predictable Premium Program constitute "sales" as defined by N.J. Stat. Ann. § 56.8-1(e).

158. As a direct and proximate cause of their reliance on Defendants' representations, Plaintiff and Subclass members have been injured, including but not limited to the loss of their purchase payments of approximately $6,000 and other monies spent in conjunction with implementing the Program's strategies.

159. As a result, Plaintiff and the Subclasses seek a refund of all monies paid to Defendants for the Predictable Premium Program, treble damages, interest, attorneys' fees, and fees and costs in an amount to be proven at trial. N.J. Stat. Ann. § 56.8-2.11.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of himself and the Classes, prays for relief and judgment against Defendants as follows:

A. For an order certifying the proposed Classes and Subclasses pursuant to Federal Rules of Civil Procedure, Rule 23;

B. For an order appointing Plaintiff and his counsel to represent the Classes and Subclasses;

C. For actual and compensatory damages according to proof pursuant to code and all other applicable laws and regulations;

D. For restitution to the extent permitted by applicable law;

E. For an order enjoining Defendants from continuing the unlawful, unfair, and fraudulent acts and practices as set forth herein, including but not limited to engaging in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint;

F. For punitive and treble damages to the extent permitted by applicable law;

G. For pre-judgment and post-judgment interest;

H. For an award of attorneys' fees, costs, and expenses as authorized by applicable law; and

I. For such other and further relief as this Court may deem just and proper.

1

## DEMAND FOR JURY TRIAL

2          Plaintiff, on behalf of himself and the Classes, demands a trial by jury on all

3   issues so triable.

4

5   Dated this 24th day of April, 2023.

                                              /s/ *Elizabeth Kramer*
6

7                                             Elizabeth Kramer

8                                             Julie Erickson, Esq.
                                              Elizabeth Kramer, Esq
9                                             Kevin Osborne, Esq.
                                              ERICKSON KRAMER OSBORNE LLP
10                                            44 Tehama Street
                                              San Francisco, CA 94105
11
                                              *Attorneys for Plaintiff*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28